# In the United States Court of Federal Claims

No. 09-289 L
(Filed: October 25, 2011)

```
*************************************
                                    *
THE DANA R. HODGES TRUST, et al.,   *
                                    *
              Plaintiffs,           *
                                    *
      v.                            *
                                    *
THE UNITED STATES,                  *
                                    *
              Defendant.            *
                                    *
*************************************
```

*Mark F. Hearne, II*, Arent Fox, LLP, Clayton, Missouri (and Washington, D.C.), for Plaintiffs; with whom were *Meghan S. Largent* and *Lindsay S.C. Brinton*, Clayton, Missouri.

*J. Nathanael Watson*, National Resources Section, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C., for Defendant; with whom was *Kenneth Rooney*, Natural Resources Section, U.S. Department of Justice, Washington, D.C.

**DAMICH**, Judge:

## OPINION

Pending before the court are the parties' cross-motions for summary judgment in this "rails-to-trails" case. Plaintiffs allege a Fifth Amendment taking of their properties which were subject to a railroad right-of-way along two segments of a corridor running from Lowell, Michigan, to Greenville, Michigan, in Kent, Ionia, and Montcalm counties.

Pursuant to a Petition for Exemption submitted by Mid-Michigan Railroad, Inc. ("Mid-Michigan," "MMRR," or "the railroad") to abandon its rail line between Lowell, at milepost 103.20, and Greenville, at milepost 78.50, the Surface Transportation Board ("STB") granted the railroad the authority to negotiate with a prospective trail use operator, cease rail operations, and convert the right-of-way into a recreational trail. The railroad did in fact reach such an agreement with a trail operator and the railroad right-of-way was converted to a recreational trail under the authority of the National Trails System Act, 16 U.S.C. § 1241 et seq. (2006) ("the Trails Act").

For the reasons stated below, the court finds that the conversion of the right-of-way to recreational trail usage constituted a taking of property rights under the Fifth Amendment, for which Plaintiffs are entitled to just compensation. Accordingly, Plaintiffs' motions[1] are granted and the Government's cross-motions are denied.

I. Background

    A. The Trails Act

"[T]he purpose of the Trails Act was to preserve unused railroad rights-of-way by converting them into recreational trails." *Barclay v. United States*, 443 F.3d 1368, 1371 (Fed. Cir. 2006). It is settled law, however, that "a Fifth Amendment taking occurs in Rails-to-Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." *Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010).

Railroads must seek the approval of the STB to officially discontinue or abandon use of a railroad corridor. *Nat'l Ass'n of Reversionary Prop. Owners ("NARPO") v. STB*, 158 F.3d 135, 137 (D.C. Cir. 1998). The Trails Act provides for a process called "railbanking" as an alternative to discontinuance or abandonment. *Caldwell v. United States*, 391 F.3d 1226, 1229 (Fed. Cir. 2004). The right-of-way is said to be "'banked' until such time as railroad service is restored." *Caldwell v. United States*, 57 Fed. Cl. 193, 194 (2003), *aff'd* 391 F.3d 1226 (Fed. Cir. 2004).

The process of abandonment begins with either an Application or what is called a "Notice of Exemption," which is a less involved process. After the Application or Notice of Exemption is filed, a proposed trail operator, such as a state, municipality, or private group, can submit a proposal for converting the railway to a trail. The proposal "must include a statement of willingness to manage the corridor, assume liability, and pay taxes." *NARPO*, 158 F.3d at 138. If the railroad and the proposed trail operator indicate a willingness to negotiate a trail use agreement, "the STB stays the abandonment process and issues a notice allowing the railroad

---

[1] Plaintiffs' original motion for summary judgment addressed only the "southern" segment of the right-of-way. "Michigan Landowners' Memorandum of Law in Support of Motion for Partial Summary Judgment" at 1 (Dkt. 40). Defendant's cross-motion and response, however, addressed both the southern and northern segments. "The United States of America's Cross-Motion for Partial Summary Judgment and Memorandum in Support Thereof and Opposition to Plaintiffs' Motion for Partial Summary Judgment" (Dkt. 44); *see also* Tr. 4:2 to 7:19, Hearing, March 11, 2011. To clarify the litigation, the court ordered a subsequent, distinct round of briefing on the northern segment. Order, March 15, 2011 (Dkt. 56).

In the discussion that follows, the court will refer to the briefings as they relate to the *southern* segment as follows: "Pls.' Mem." (Dkt. 40); "Pls.' PFUF" (Dkt. 41, "Plaintiffs' Proposed Findings of Uncontroverted Fact"); "Def.'s Cross-mot. and Resp." (Dkt. 44); Pls.' Reply and Resp. (Dkt. 49); and Def.'s Reply (Dkt. 52). The briefings as they relate to the *northern* segment are referred to as: "Pls.' Mem. – N. Segment" (Dkt. 59); "Pls.' PFUF – N. Segment" (Dkt. 60); "Def.'s Cross-mot. and Resp. – N. Segment" (Dkt. 63); "Pls.' Reply and Resp. – N. Segment" (Dkt. 70); and "Def.'s Reply – N. Segment" (Dkt. 72).

right-of-way to be 'railbanked.'" *Caldwell,* 391 F.3d at 1229.[2] The determination of the railroad whether to engage in such negotiations is voluntary. *Nat'l Wildlife Fed'n v. Interstate Commerce Comm'n*, 850 F.2d 694, 702 (D.C. Cir. 1988). If the railroad agrees to negotiate a Trails Act agreement, however, the STB is required to issue a "NITU" ("Notice of Interim Trail Use or Abandonment"), in exemption proceedings, or a "CITU" ("Certificate of Interim Trail Use or Abandonment"), in abandonment application proceedings. *Barclay*, 443 F.3d at 1376; *Capreal v. United States*, 99 Fed. Cl. 133, 136 (2011). If a trail use agreement is not reached, the NITU expires 180 days after its issuance.

This case involves a NITU, which "permits the railroad to discontinue service, cancel tariffs, and salvage track and other equipment, 'consistent with interim trail use and rail banking' without consummating an abandonment." *Caldwell*, 391 F.3d at 1230. If an agreement is reached between the railroad and the trail operator, "the NITU extends indefinitely to permit interim[3] trail use." *Id*. The STB's issuance of the NITU suspends exemption proceedings for 180 days to allow for negotiation of an agreement. *Barclay*, 443 F.3d at 1371; 49 C.F.R. § 1152.29(b)(2) and (d). "If no trail use agreement is reached, the NITU converts into an effective notice of abandonment, allowing the railroad to 'abandon the line entirely and liquidate its interest.'" *Barclay*, 443 F.3d at 1371 (quoting *Preseault v. I.C.C.*, 494 U.S. 1, 7 (1990) ("*Preseault I*")); *see also Ladd*, 630 F.3d at 1023 ("Alternatively, negotiations may fail, and the NITU would then convert into a notice of abandonment.").

If an agreement is reached, "the STB retains jurisdiction for possible future railroad use, and state law reversionary interests that would normally vest upon abandonment are blocked." *Caldwell*, 391 F.3d at 1230. As the Federal Circuit has held: "The taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting." *Id.* at 1233. It has further held that successfully "entering into a trail use agreement and converting the railway to a recreational trail" are not necessary elements of a takings claim. "Hence, it is irrelevant that no trail use agreement has been reached and that no recreational trail has been established." *Ladd*, 630 F.3d at 1024. Because "the issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests," *id.*, "the appropriate triggering event for any takings claim under the Trails Act occurs when the NITU is issued." *Caldwell*, 391 F.3d at 1235.

B. Factual Background

On February 20, 2008, MMRR filed a petition with the STB seeking authority to abandon the 24.7-mile stretch of its rail line between Lowell and Greenville. Pls.' PFUF, Exh. 177. MMRR had acquired the line from CSX Transportation, Inc., and began operating in 1987. *Id*. at

---

[2] Thus, for the railroad, interim trail use is more like discontinuance but without retaining liability, while theoretically "preserving the rail corridor for possible reactivation of service in the future." *Preseault v. I.C.C.* ("*Preseault I*"), 494 U.S. 1, 5 n.3 (1990).

[3] Trail use is deemed "'interim' because the corridor may be returned to active railroad use in the future." *NARPO*, 158 F.3d at 138 n.5 (citing *Birt v. STB*, 90 F.3d 580, 583 (D.C. Cir. 1996)).

34. One portion of that overall corridor, from Greenville to Belding, Michigan, was opened in 1871 by the Detroit, Lansing & Lake Michigan Railroad Company. *Id*. The Belding to Lowell portion was opened by Grand Rapids, Belding and Saginaw Railroad Company in 1899. *Id*. Both portions became part of the Pere Marquette Railroad Company in 1900. *Id*. In 1947, C&O Railway Company acquired Pere Marquette, *id*., and was itself later merged into CSX. When MMRR obtained the lines in question in 1987, it was a subsidiary of RailTex, Inc., which merged into RailAmerica, Inc., in 2000. *Id*.

According to MMRR's petition to the STB, "[t]raffic on the line ha[d] declined to the point where no traffic moved in 2007 and no traffic has moved to date in 2008." *Id*. at 4-5. MMRR advised the STB that, upon receipt of authority to abandon, it planned to salvage the tracks and related materials, but that the ties, bridges, and culverts would be left in place to facilitate "interim trail use/rail banking" per a memorandum of understanding it had reached with a proposed trail operator, the West Michigan Trails and Greenways Coalition ("WMTGC" or "Greenways Coalition"). *Id*. at 5-6. MMRR described the line as a "stub end track" and expressed its preference "to obtain authority to abandon the Line and convert it to interim trail use/rail banking through the sale to WMTGC." *Id*. at 25.

In the Memorandum of Understanding ("MOU") between MMRR and WMTGC, dated October 17, 2007, the parties thereto proposed an agreement whereby WMTGC would purchase the Greenville to Lowell line as well as an MMRR rail line from Lowell to Ionia, Michigan (not the subject of this case) for "between $1,945,000 and $2,550,000." Pursuant to the Trails Act, the parties would pursue use of the line as a recreational trail "subject to construction and reactivation of the right-of-way for rail service" in the future. *Id*., Exh. 180. In the MOU, WMTGC acknowledged that the lines "have been historically used for railroad industrial operations." *Id*.

      1. Southern Segment

In accordance with the MOU agreement, WMTGC filed a request on March 6, 2008, with the STB for a NITU for the portion of the line running from milepost 103.20 near Lowell to milepost 81.32 near Greenville, a distance of 21.88 miles. *Id*., Exh. 182. In its request, WMTGC stated its willingness to assume responsibility for management of the rail line, for legal liability arising from use thereof, and for the payment of taxes levied on the right-of-way. *Id*. It also acknowledged that the right-of-way would be subject to possible future reconstruction and reactivation of the line for rail service. *Id*.

The STB issued the requested NITU on June 9, 2008. *Id*., Exh. 185. The STB construed the MOU as signifying MMRR's consent to negotiate with WMTGC for interim trail use and gave the railroad to December 8, 2008, to reach a trail use/railbanking agreement. *Id*. at 5, ¶ 7. On December 4, 2008, however, the STB was informed by another proposed trail operator, the Friends of Fred Meijer Heartland Trail ("Friends of Fred") that WMTGC and MMRR were unable to finalize negotiations for a trail use agreement and that Friends of Fred desired to continue the negotiations with the railroad in place of WMTGC. *Id*., Exh. 193. Friends of Fred, therefore, requested an extension of the negotiation period for an additional 180 days. *Id*.

MMRR in turn advised the STB of its willingness to pursue a trail agreement with Friends of Fred covering the same extent of the rail corridor. *Id*., Exh. 194.

On December 23, 2008, the STB vacated the prior NITU and issued a new NITU, extending the negotiation period to June 21, 2009. *Id*., Exh. 195.

### 2. Northern Segment

In April 2009, while the NITU was pending with respect to the 21.88-mile southern segment, Friends of Fred submitted a request to the STB for a NITU covering the remaining 2.82-miles of the corridor that was the subject of MMRR's original petition for abandonment exemption. This portion, from milepost 81.32 in Greenville to milepost 78.50 in Greenville, was described as the "northern" segment of the overall right-of-way in question. *Id*., Exh. 196. Friends of Fred provided the requisite statement of willingness to assume financial responsibility. *Id*. MMRR agreed to pursue negotiations for interim trail use/railbanking with Friends of Fred over this segment. *Id*., Exh. 197. On April 28, 2009, the STB issued a NITU with respect to this northern segment and set a deadline of October 25, 2009, for reaching an agreement. *Id*., Exh. 198.

### 3. Deadlines Extended

In June 2009, at the request of Friends of Fred, *id*., Exh. 199, and with the concurrence of the railroad, *id*., Exh. 200, the STB again extended the period in which MMRR could seek to negotiate a trail use agreement for the southern segment. The new period extended to March 31, 2010. *Id*., Exh. 201. In November 2009, a similar extension, to March 31, 2010, was granted by the STB with respect to the northern segment. *Id*., Exh. 204. Yet another extension of time, as to both segments, was granted by the STB, again at the request of Friends of Fred and with the railroad's support, to September 27, 2010. *Id*., Exh. 207.

On September 24, 2010, MMRR advised the STB that it had finalized an agreement with Friends of Fred for the sale of the two segments for interim trail use and railbanking. *Id*., Exh. 209. Its letter noted, "Since MMRR has transferred the Line to Friends for interim trail use/rail banking, MMRR has not consummated the abandonment of the Line . . . ." *Id*.

## II. Standard of Review

Summary judgment is a "salutary method" of procedure under the Rules of the Court of Federal Claims ("RCFC") to dispose of actions, where warranted, in a just, speedy, and inexpensive manner. *See Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987). A motion for summary judgment will be granted if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." RCFC 56 (c )(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When considering a summary judgment motion, the court's proper role is not to "weigh the evidence and determine the truth of the matter," but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it "might affect the

outcome of the suit;" a dispute is genuine if the evidence is such that a reasonable trier of fact could find for the nonmoving party. *Id*. at 248.

The party moving for summary judgment may prevail by demonstrating the absence of any genuine issues of material fact or by showing the absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 322-23. If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that there is a genuine issue of material fact. *Id*. at 324. Any inferences that may be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Similarly, "[i]n cases in which there is doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of the nonmovant." *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984). "The movant also must demonstrate its entitlement to judgment as a matter of law." *Id*.

When the parties have cross-moved for summary judgment, the court reviews the motions under the same standards. *First Annapolis Bancorp., Inc. v. United States*, 75 Fed. Cl. 263, 275 (2007). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id*.

III. Discussion

The court analyzes the question of a Fifth Amendment taking in a rails-to-trails claim according to the analytical framework set up by the Federal Circuit in *Preseault v. United States ("Preseault II")*, 100 F.3d 1525 (Fed. Cir. 1996):

Under *Preseault II*, the determinative issues for takings liability are (1) who owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate; (2) if the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and (3) even if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).

*Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009).

A. Southern Segment

Some 58 landowners hold title to 48 parcels of land abutting and underlying the southern segment of the railroad right-of-way. As acknowledged by Defendant, all 48 deeds include language expressly referring to the conveyance of an easement to the railroad. "Forty eight deeds referenced by Plaintiffs all include language expressly referring to the conveyance as an

6

'easement' and 'forever, a strip of land for a Right of Way' to the railroad." Def.'s Cross-mot. and Resp. at 16. Although "[t]he United States recognizes that these deeds convey an easement," however, it argues that the easement was for a right-of-way for a public highway and thus that "the scope of the easement includes interim trail use and railbanking." *Id*. at 16, 17.

The inquiry before the court is therefore the scope of the easement. With respect to the southern segment, there is no dispute over the first of the three inquiries posed by the Federal Circuit in *Preseault II*.

1. Scope of the Easement

The parties agree that the pertinent language in the deeds at issue is:

> For [the railroad][4] to build, construct and maintain a railroad in and over said strip of land and at all times to pass and repass by themselves, their servants, agents and employees, with their engines, cars, horses, cattle, carts, wagons and other vehicles and transport freight and passengers and do all other things properly connected with or incident to the location, building, maintaining and running, the said road and to use the earth and other materials within said strip of land for that purpose. To have and to hold the said easements and privileges to the [railroad] and its successors, lessees and assigns forever.

Def.'s Cross-mot. and Resp. at 20; *accord* Pls.' Mem. at 3 ("Because the language of all forty-eight deeds is identical in all respects except the property description, the grantor's name, and the date, there is essentially only one 'deed' that this Court must construe in determining liability"); *see also* Pls.' PFUF, Exhs. 14-61.

Inasmuch as an easement is "'a right which one person has to use the land of another for a specific purpose,'" *Eyde v. State*, 82 Mich. App. 531, 541, 267 N.W.2d 442, 447 (Mich. App. 1978), citing *St. Cecilia Soc'y v. Universal Car & Service Co*., 213 Mich. 569, 576-77, 182 N.W. 161, 164 (1921), the dispute between the parties here centers on the proper interpretation of the purpose of the grant of the easement. Plaintiffs argue that the language of the conveyances "make clear the owners' grant of the easement was intended for the purpose of building and operating a railway across the land and nothing more . . . ." Pls.' Mem. at 25. Defendant, by contrast, contends that interim recreational trail use and railbanking are within the scope of the easement because (1) the original conveyances did not limit the easement to "railroad purposes," (2) courts interpreting identical grants under Michigan law have held that railbanking is consistent with the right of usage, and (3) Michigan public policy favors interim trail use and railbanking.

Under Michigan law, "[i]n order to determine whether the easement at issue . . . is limited to a specific purpose, we must discern the parties' intent as shown by the plain language of the

---

[4] The reference to the railroad as the grantee is generally in the form of "for the said party of the second part and its successors, lessees and assigns and their servants and agents . . ." PPFUF, Exh. 14-61.

7

deed." *Mich. Dep't of Natural Res. v. Carmody-Lahti Real Estate, Inc.*, 699 N.W.2d 272, 284-85 (Mich. 2005). Here, although the deed language does not use the specific phrase, "railroad purposes," it is certainly evident that the grant intends to allow the railroad (and its successors, lessees, and assigns) usage of a particular strip of land for specified railroad-related activities.

First, it grants the railroad use of the strip of land in order to build, construct, and maintain a railroad. It specifies that, in the course of doing so, the railroad's servants, agents, and employees (and successors, lessees, et al.) may pass in and over the conveyed strip of land with their engines, cars, horses, cattle, carts, wagons and other vehicles. It says that the grant is for the transport of freight and passengers. It elaborates that the railroad may also do all such "other things" as are properly connected with or incident to aspects of the said road, i.e., locating, building, maintaining, and running a railroad. It also allows the railroad to use the earth and materials within the specified strip of land "for that purpose." Finally, it grants the easement "forever."

Defendant suggests that the plain language above "convey[s] a broad easement," inclusive of but not limited to "railroad purposes." Even though in fact a railroad was built and operated on the land, Defendant argues that the lack of an express limitation for railroad purposes distinguishes the easement here from that in *Carmody-Lahti*.

In *Carmody-Lahti*, the Michigan Department of Natural Resources, as the successor-in-interest to a railroad right-of-way, sought an injunction to preclude a servient landowner from blocking use of the right-of-way for snowmobile and recreational trail use. After determining that the state agency's interest was an easement rather than a fee estate, the Michigan Supreme Court addressed the proximate question regarding the scope of the easement. The court noted that the original grantor, a mining company, had conveyed a right-of-way "for the railroad," reserving to the grantor the right to extract minerals from the strip of land, but only, however, "in such manner as not to interfere with construction or operation of said railroad." *Carmody-Lahti*, 699 N.W.2d at 285. In addition, the deed's habendum clause[5] stated that the right-of-way was granted "for the purpose and uses above stated and subject to the reservations aforesaid . . . ." *Id*. Accordingly, the court held that the easement was limited to "railroad purposes."

Defendant argues that the habendum clause in Carmody-Lahti established a limitation lacking in the deed language here. It also notes the "all other things" language and the reference to "engines, cars, horses, cattle, carts, wagons, and other vehicles" as negating any specific limitation to railroad usage, citing *Department of Natural Res. v. Leukuma*, No. 287802, 2009 WL 5194517 at *5 (Mich. App. Ct. Dec. 17, 2009) ("There is no similar language in the present conveyance expressing that the right-of-way was to be conveyed for the specific limited purpose of railroad business. Nor is there any other language (e.g., 'as now used;' 'for railroad purposes') that could be construed as limiting the easement strictly to railroad usage.").

This court finds Defendant's distinctions and reliance on *Leukuma* unpersuasive. Unlike the conveyance in *Leukuma*, the "all other things" language of the deed here is manifestly limited

---

[5] *Black's Law Dictionary* defines "habendum clause" as "[t]he part of an instrument, such as a deed or will, that defines the extent of the interest being granted and any conditions affecting the grant." *Black's Law Dictionary* 728 (8th ed. 2004).

("properly connected with or incident to") to the purposes of "the location, building, maintaining, and running" of a railroad. Similarly, the reference to engines, cars, and horses, etc., relates to the means of effectuating the passage of the railroad's employees, agents, et al., rather than as transportation purposes in themselves in the grant of the right-of-way. Furthermore, the reference to "that purpose" regarding the use of earth and materials grammatically signifies that a purpose of the grant has previously been recited. The deed in *Leukuma*, unlike the deed here or in *Carmody-Lahti*, made no reference to an easement "for a railroad" and lacked reference to any discernable railroad purpose whatsoever, other than a description of the physical location of the strip of land "being Thirty (30) feet wide on each side of its center line of the [railroad]." *Leukuma*, at *4. Thus, the court there found merely that "where the railroad tracks were currently located appears to have served as the means of determining where the easement would begin and end." *Id*. *Leukuma* provides no support for Defendant's argument here.

Defendant also relies on *Belka v. Penn Central Corp.*, No. 1:92-cv-581, 1993 U.S. Dist. LEXIS 15836 (W.D. Mich. Oct. 14, 1993), arguing that interim trail use and railbanking were found "within the scope of a grant nearly identical to the one at issue here." Def.'s Cross-mot. and Resp. at 20-21. In *Belka*, the plaintiffs had sought to quiet title to a railroad corridor on the grounds that the railroad's right-of-way easement had been terminated by abandonment or impossibility of use. The defendant railroads counterclaimed for a declaratory judgment that the scope of the right-of-way encompassed recreational trail activities. Both sides here agree that the language in the *Belka* conveyance is "nearly identical" to the deed language in the instant dispute. Pls.' Mem. at 16 n.43; Def.'s Cross-mot. and Resp. at 21.

The *Belka* court noted that "[w]hether Defendants intended to abandon their property rights cannot be determined without consideration of the nature of that property interest." *Belka*, at *15. It then held flatly, "[the defendants] had an easement to use [the railroad corridor] 'for railroad purposes.'" *Id*. Even so, the defendants in *Belka* argued for a broad definition of "railroad purposes," consistent with "changing times and public policy," that would encompass recreational trail usage. *Id*. In that respect, the court noted the declaration in the Michigan Transportation Preservation Act, M.C.L. § 474.51 et seq.; M.S.A. § 22.180(21) et seq., that the preservation of abandoned railroad rights-of-way "for future rail use and their interim use as public trails" is a public purpose. *Id*. It also noted the federal Trails Act's recognition of a "'national policy to preserve established railroad rights-of-way for future reactivation of rail service.'" *Id*. at *16, citing U.S.C. § 1247(d).

Accordingly, it "agree[d] with Defendant's contention that railbanking would be consistent with the permanent nature of the original grant." It observed that "[e]ven a strict reading of the grant would permit the grantee to cease railroad operations, remove the track, and 'railbank' the property for future sale to another party *for use consistent with the terms of the grant*." *Id*. at *17 (emphasis added). Because the defendant railroads, however, had not actually pursued preservation of the right-of-way for future reactivation of rail service, inasmuch as they had sold off portions of the corridor without a reservation of a right of use for railroad purposes in the future, the *Belka* court found that the defendants had abandoned their easement as a matter of law.

9

The decision in *Belka*, then, offers little, if any, support to the scope-of-easement argument that Defendant makes here.  First, the court in *Belka* found that the nearly identical deed was for railroad purposes.  It then noted in dicta that a strict reading of that grant would allow railbanking, but only in the sense that the railroads could cease railroad operations and offer the property to a third party for future use consistent with railroad purposes.  In this respect, as Plaintiffs argue, "the broadest reading of *Belka* would be that the railroad may 'discontinue' rail service (as, for example under the present day 49 U.S.C. §10903(a)(1)(B)) while the railroad maintains the intact railroad corridor for sale to another railroad '*for use consistent with the terms of the grant*.'"  Pls.' Reply and Resp. at 12 (emphases in original).  This court finds that the *Belka* court, at best, sidestepped the question whether recreational trail use was within the scope of the easement.  "By giving up their easement for rails, Defendants also gave up any argument for an easement for trails."  *Belka,* at *18-19.

Furthermore, the Michigan Supreme Court in *Carmody-Lahti* essentially disposed of the *Belka* defendants' argument for a broad interpretation of "railroad purposes": "[T]he 'manner, frequency, and intensity' of [a] grantee's use of [an] easement may change through time . . . But, where a deed grants an easement limited to railroad purposes, it is only the 'manner, frequency, and intensity' of *railroad uses* that may change over time."  *Carmody-Lahti*, at 284 n.42 (emphasis in original).

Defendant's last argument for a broader reading of the scope of the easement is based upon the previously referenced Michigan public policy in favor of preservation of abandoned railroad corridors for future rail use and interim use as recreational trails.  The argument is that railroads have the authority to take land via condemnation for "public use," that "interim trail use by the public is a use of the right-of-way for public purposes," and therefore that interim trail use is "inextricably linked" to the easement here, which "anticipates the transportation of public goods."  Def.'s Cross-mot. and Resp. at 22.

Plaintiffs respond, and this court agrees, that the Michigan Supreme Court in *Carmody-Lahti* considered immaterial the "policy" rationale put forward for so broadly reading the scope of an easement for railroad purposes.

> But the question of how the land ought to be used is not before us.  Instead, this appeal presents us with the more modest task of discerning the meaning of a late-nineteenth century deed. . . . If the right-of-way is an easement, we must then establish whether [the railroad] has exceeded the scope of the easement or has abandoned it.

*Carmody-Lahti*, 699 N.W.2d at 279.

The Federal Circuit in *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) (en banc) ("*Preseault II*"), a Vermont-based rails-to-trails case, considered an even more emphatic[6] state statute:

---

[6] The Vermont statute was more than a mere statement that interim trail use was a public purpose.  It "authorizes, indeed instructs, the State to retain any unused railroad rights-of-way it owns for future transportation uses, and in

10

> [T]he statute does not state that such actions are without consequences to the property owners, nor does it say that the property owners will not, or must not, be compensated for such actions. The statute is in fact wholly silent on the question of compensation. Obviously the State could not simply by enactment of a statute immunize itself from the salutary provisions of the Fifth Amendment. The issue is not whether the State or Federal governments had the power or obligation to do what they did, but whether the Constitution requires that just compensation be paid as a consequence. The existence of the statute thus adds nothing to the Government's defense.

*Id*. at 1551-52 (footnotes omitted).

Here, similarly, the Michigan statute's declaration of trail use as a public purpose cannot properly be employed to enlarge the scope of a railroad easement granted many decades prior in derogation of the intent of the parties to the original grant of the right-of-way. *Preseault II*, 100 F.3d at 1552; s*ee also Hash v. United States*, 403 F.3d 1308, 1315 (Fed. Cir. 2005). Certainly, it is not sufficient by itself to shield the Government from the obligation of just compensation if otherwise warranted.

Defendant argues that even the original easements were, under Michigan law, acquired for "public use." Mich. Comp. Laws § 11135 (1929) ("All real estate or property whatsoever, acquired by any company under and in pursuance of this act, for the purpose of its incorporation, shall be deemed to be acquired for public use.")[7]; *Quinn v. Pere Marquette Ry. Co.*, 239 N.W. 376, 380 (Mich. 1931). Defendant reasons that, therefore, any public purpose or use, such as a recreational trail, is inherently encompassed within the scope of the easement unless the proposed use is "plainly repugnant to or varying from the purpose originally contemplated as to amount to a change of user." Def.'s Reply at 13 (quoting *Barnes v. Michigan Air Line Ry*., 32 N.W. 426, 427 (Mich. 1887)).

Defendant's argument, however, is circular. The inquiry nevertheless must focus on the use "originally contemplated." This court finds that the right-of-way conveyed was an easement precisely for railroad purposes.

Implicit in the holding in *Carmody-Lahti* is that an easement for railroad purposes did not encompass recreational trail use and snowmobiling. The railroad had not merely abandoned the railway itself, but, more significantly, it had "manifested an intent to abandon the underlying easement" for railway purposes when it sought ICC permission to abandon and it removed the

---

the meantime to use them for other public purposes not inconsistent with future transportation purposes." *Preseault II*, 100 F.3d at 1551.

[7] This court questions the relevance of this statute in any event, inasmuch as it plainly refers to property acquired via condemnation under color of the state's power of eminent domain, rather than to the easements obtained here by voluntary deed.

rails. Had the easement for railway purposes encompassed recreational trail usage, there would have been no basis for the finding of abandonment:

> An easement holder abandons a railroad right-of-way when 'non-user is accompanied by acts on the part of the owner of either the dominant or servient tenement which manifest an intention to abandon, and which destroy the object for which the easement was created or the means of its enjoyment . . . .'

*Carmody-Lahti*, 699 N.W.2d at 287 (quoting *Jones v. Van Bochove*, 103 Mich. 98, 101, 61 N.W. 342, 343 (Mich. 1894).

If the easement for railroad purposes had included trail use, then the "object for which" it was created or the means of its enjoyment would not have been destroyed merely because the rails had been removed. Trail usage in fact would have been enhanced.

That "railroad purposes" are distinct from recreational trail usage has also been noted by the Federal Circuit:

> [I]t appears beyond cavil that use of these easements for a recreational trail – for walking, hiking, biking, picnicking, Frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway – is not the same use made by a railroad, involving tracks, depots, and running of trains. The different uses create different burdens.

*Toews v. United States*, 376 F.3d 1371, 1376 (Fed. Cir. 2004).

This court finds that the scope of the easements at issue in the southern segment was a right-of-way for railroad purposes and that such purposes are distinct from, and inconsistent with, use of the right-of-way as a recreational trail.

Defendant, citing *Belka*, also argues that, "[w]hen a railroad acts to preserve the integrity of a railroad corridor through railbanking, that is a 'railroad purpose' and consistent with the original grant of an easement limited to railroad purposes.'" Def.'s Cross-mot. and Resp. At 18. Had the railroad simply discontinued its rail service or sold its rail corridor, subject to the easement, to another railroad entity, which either took over rail operations or was holding the corridor for future rail reactivation, it may be that plaintiffs would have no grounds for a takings claim. When the interim right-of-way usage, however, is outside the scope of the easement, it is not enough to argue that preservation of the railroad corridor for hypothetical future use comports with the easement. *Farmers Co-op. Co. v. United States*, 98 Fed. Cl. 797, 804 (2011).

Because the easement is not broad enough to encompass a recreational trail, it is not necessary to address the third prong of the *Preseault II* inquiry (whether the easement terminated prior to the alleged taking).

Plaintiffs' motion for summary judgment with respect to the southern segment is granted and Defendant's cross-motion is denied.

B.  Northern Segment

1.  Nature of Railroad's Interest in the Properties Claimed by Plaintiffs

Seven property-owners allege a taking of land they own in the northern segment of the rail corridor, as to which the STB first issued a NITU on April 28, 2009. Plaintiffs contend that MMRR's predecessors built this segment across these parcels of land without having obtained any grant from the Plaintiffs' predecessor fee estate owners, unlike the grants at issue in the southern segment. In support, they offer certain "valuation maps" ("val-maps"), dated June 30, 1915, to show the interest in the properties acquired by the railroad. Pls.' PFUF – N. Segment, Exs. 242, 243. These val-maps simply recite, "no deed," for the rights-of-way at issue. Def.'s Reply – N. Segment at 2. Therefore, Plaintiffs aver, "[a]s a matter of Michigan law, the railroad held only a prescriptive easement to operate a railroad across this strip of land." Pls.' Mem. – N. Segment at 3.

Defendant argue that Plaintiffs have failed to meet their burden of showing "evidence sufficient to prove the nature of the property interest acquired by the railroad on those portions of the right-of-way that abut their property." Def.'s Cross-mot. and Resp. – N. Segment at 1. "Their claim that 'no deed' means 'prescriptive easement' is insufficient to meet their burden under Rule 56." Def.'s reply – N. Segment at 2. Defendant reasons that, to show a taking, Plaintiffs must demonstrate their ownership of the property allegedly taken. "Establishing title to the property allegedly taken is essential to asserting a taking." *Amaliksen v. United States*, 55 Fed. Cl. 167, 171 (2003). Secondarily, Defendant maintains that, even if the court finds the "no deed" phraseology on the valuation map sufficient to demonstrate the railroad's prescriptive easements, interim trail use and railbanking are still within the scope of such easements.

An initial question is which party here must demonstrate evidence of the railroad's interest in the right-of-way. The Plaintiffs have submitted deeds and tax records to show their fee interest in the properties at issue. Pls.' PFUF – N. Segment, Exs. 219-238. They offer the val-maps as evidence that the railroad could have acquired at best a prescriptive easement.[8] The val-maps were prepared by the ICC to "report the value of all property owned or used by every common carrier," pursuant to the Railroad Valuation Act of 1913, 49 U.S.C. § 10781-10786, 37 Stat. 701, repealed 92 Stat. 1466, 1470, Pub. L. No. 95-473, § 4(b), (b) (Oct. 17, 1978). It is not disputed that the val-maps pertinent to the claims by Plaintiffs are marked "no deed." As to the parcels of land claimed by the Plaintiffs in fee, the val-maps otherwise fail to indicate any recorded conveyance at all to or for any railroad over these properties. Nor has Defendant itself produced any conveyance by which MMRR or its predecessors obtained an interest in the right-of-way at these parcels.

---

[8] "Prescription . . . is a mode of acquiring title to property or rights in property by long continued possession, use, and enjoyment," *Dunner v. United States Gypsum Co.*, 153 Mich. 622, 117 N.W. 317, 320 (Mich.1908), comparable to adverse possession.

Defendant argues that "[i]f Plaintiffs own an interest in land, they are obligated, especially in the absence of any documents showing what interest the railroad took, to prove their own title chain back to at least the time when the valuation map was produced." Def.'s Cross-mot. and Resp. at 5. "Doing so," it elaborates, "would potentially demonstrate that no intervening deed set forth the nature of the railroad's property interest." *Id*. Plaintiffs characterize the Government's argument as the hypothesis that an intervening deed may exist conveying "something more" than an easement to the railroad. "[T]he government then contends that unless the Plaintiffs can prove such a hypothetical document does not exist, the railroad owned the land. The government provides no evidence to support this theory." Pls.' Reply and Resp. – N. Segment at 6.

Certainly the Plaintiffs have produced documentary evidence – their deeds, tax records, and the ICC val-maps – although Defendant may dispute their sufficiency. Further, it is undisputed that the railroad line was built, and a railroad operated, across the land in question. Defendant acknowledges that, under Michigan law, "a railroad takes a prescriptive easement when it acquires land by adverse possession and there is no recorded instrument," Def.'s Cross-mot. and Resp. at 6 (citing *Michigan Cent. R.R. Co. v. Garfield Petroleum*, 290 N.W. 833, 835 (Mich. 1940)). It argues, however, that the val-maps are not adequate evidence of the railroad's property interest and, lacking any recorded instruments of the railroad's interest, that is why Plaintiffs are obligated to prove their title chain at least as far back as the val-maps.

Defendant cites *Amaliksen* in arguing against reliance on the val-maps as evidence of the railroad's acquisition of a prescriptive easement only. "Those valuation maps are not material evidence of the railroad's property interest." Def.'s Reply – N. Segment at 1. In *Amaliksen*, the claim was of a Fifth Amendment taking of land in Vermont that had been subject to a railroad easement, since abandoned. The court concluded that the plaintiffs did not own the land that had been subject to the easement. When the court in *Amaliksen* wrote that it "attaches little significance to the colorations on the valuation map," *Amaliksen*, 55 Fed. Cl. at 175, it was because of particular facts not at play in this case. There, the record showed the award of an easement in 1863 to the railroad in the first place and a subsequent 1868 deed showed a grant of title in fee to the railroad overlapping a significant portion of the easement. The 1914 valuation map in question described the railroad's interest only as an easement. Because "[t]he purpose of such maps was to identify parcels for valuation, not to distinguish types of ownership," the court disregarded the val-map's significance in light of the contrary and overriding weight of the actual deeds. The court noted the difficulty of "devising [on the map] a hybrid designation of areas covered initially by easement and then by fee." Here, there are no contradictory deeds or other conveyances nor are the val-maps' reference to "no deeds" ambiguous.

In the absence of any indication or evidence to the contrary, the val-maps here showing "no deed" are empirically consistent with Plaintiffs' contention that the railroad right-of-way as to Plaintiffs' claims was obtained without any grant but rather via adverse possession. The court also notes the lack of any documents produced showing any railroad interest greater than a prescriptive easement from 1915, the date of the val-maps, to the present. Thus, together with Plaintiffs' deeds and tax records, the court sees no genuine issue in dispute precluding a finding that the railroad's interest at the time of the alleged takings was no more than a prescriptive easement. *Accord Thompson v. United States*, No. 09-612 L, 2011 WL 4914782, Fed. Cl.,

October 13, 2011, at *12-13; *see also Macy Elevator v. United States*, 97 Fed. Cl. 708, 720 (2011) ("Someone challenging the adjoining landowner's interest in the fee would have the burden of showing that a deed including the right-of-way exists. The government cannot defeat summary judgment by merely suggesting that deeds that include a reference to the right-of-way might exist.").

      2.  Scope of Easement by Prescription

Defendant further avers that even if the railroad obtained a prescriptive easement, it would be "broad enough, under Michigan law, to allow for interim trail use and railbanking." Def.'s Cross-mot. and Resp. – N. Segment at 5. Defendant relies on *Garfield Petroleum* for its argument that a prescriptive easement obtained by a railroad is "for general public purposes." *Garfield Petroleum*, 290 N.W. at 839. The issue in that case, a quiet title action in which the plaintiff railroad claimed it was the owner in fee simple of land acquired by adverse possession, was "whether a railroad company secures, by adverse possession, an absolute fee in land, over which it lays tracks and operates trains, continuing such user for the prescriptive period." *Id*. at 833. The sub-context of the dispute was the defendant's claim of absolute title to mineral rights underlying the railroad right-of-way.

In the course of its review, the court traced the distinction between railroad corporations and "others" in the acquisition of land by adverse possession or by condemnation. "We are of the opinion that railroad corporations are, in a marked degree, to be treated differently from other persons and other corporations in regard to the acquisition of land by adverse possession." It explained:

> Property of individuals taken by railroad corporations for the purpose of constructing their road is, in legal contemplation, taken not for private use, but for a public use, and the tenure of railroads in lands condemned for such purpose is in the nature of a trust for public use.

*Id*. at 834.

Defendant reasons that, if a railroad easement by prescription is "for a public use," and Michigan has statutorily determined that "preservation of abandoned railroad rights of way for future rail use and their interim use as public trails is declared to be a public purpose," Mich. Comp. Laws § 474.51(3), therefore the railroad's prescriptive easement is broad enough to include those uses.

Defendant, however, is overstating the point of the court's use of the phrase, "public use," as applied to railroads, in *Garfield Petroleum*. The Michigan court was drawing on the rationale for the state's delegation of the power of eminent domain to turnpike, plank road, bridge, ferry, canal, and railroad companies: "All this class of incorporations have been enacted upon the hypothesis that the lands taken for these purposes were taken for public use, and not for private endowment." *Id*. The court also emphasized a noteworthy limitation on the property interest obtained. "[T]he right delegated in virtue of the eminent domain of the government, and

15

derogatory to those of the citizen whose property is condemned, must be construed as conferring no right to hold the property in derogation of the purposes for which it was taken." *Id*. Thus, the court observed, "[t]he general rule is that where an easement is claimed by user the easement can be no broader than the use. The extent of the easement in such case is to be determined by the actual use and possession." *Id*. at 834-35.

In a condemnation proceeding, "it would appear that the extent of [the railroad's] right and possession would be restricted to railroad purposes." *Id*. at 835.

Accordingly, this court does not read *Garfield Petroleum* as support for Defendant's argument that, because a railroad's prescriptive easement is in the nature of a "public use," therefore its scope extends to *any* public use. "The use of an easement must be confined strictly to the purposes for which it was granted or reserved." *Tomecek v. Bavas*, 482 Mich. 484, 490, 759 N.W.2d 178, 183 (Mich. 2008), citing *Delaney v. Pond*, 350 Mich. 685, 687, 86 N.W.2d 816 (Mich. 1957).

The court finds that the railroad's easements in these Plaintiffs' properties in the northern segment were for railroad purposes and that, for the same reasons discussed *supra* with respect to the easements in the southern segment, such railroad purposes do not extend to recreational trail usage. Similarly, it is not necessary then to address the third prong of the *Preseault II* inquiry (whether the easement terminated prior to the alleged taking).

IV. Conclusion

For the reasons stated above, the court GRANTS Plaintiffs' motions for summary judgment, respecting both the southern and northern segments of the railroad corridor at issue, and DENIES Defendant's cross-motion for summary judgment.

s/ Edward J. Damich  
EDWARD J. DAMICH  
Judge