# In the United States Court of Federal Claims

No. 09-289 L
(Filed: June 21, 2013)

```
*************************************
                                     *
THE DANA R. HODGES TRUST, et al.,    *
                                     *
                    Plaintiffs,      *
                                     *
     v.                              *
                                     *
THE UNITED STATES,                   *
                                     *
                    Defendant.       *
                                     *
*************************************
```

*Mark F. (Thor) Hearne, II*, Arent Fox LLP, Clayton, MO, for Plaintiffs; with whom were *Meghan S. Largent*, *Lindsay S.C. Brinton*, Arent Fox LLP, Clayton, MO, and *Debra J. Albin-Riley*, *Joseph L. Cavinato, III*, Arent Fox LLP, Los Angeles, CA.

*Joseph Nathanael Watson*, Natural Resources Section, Environment & Natural Resources Division, U.S. Department of Justice, Washington, DC, for Defendant.

---

**OPINION**

---

**DAMICH, Judge**:

The parties have filed opposing motions for summary judgment in this "rails-to-trails" case on the question whether certain plaintiffs retain or otherwise possess rights to cross the recreational trail corridor that bisects their properties. What had been a right-of-way for railroad purposes was converted by operation of the National Trails System Act, 16 U.S.C. § 1241 et seq. (2006) ("the Trails Act") to a recreational trail (and reserved via "railbanking" for the possibility of future rail service). This court has previously held that "the conversion of the right-of-way to recreational trail usage constituted a taking of property rights under the Fifth Amendment, for

which Plaintiffs are entitled to just compensation." *Dana R. Hodges Trust v. United States,* 101 Fed. Cl. 549, 550 (2011); *see also Thompson v. United States*, 101 Fed. Cl. 416 (2011).[1]

As Defendant notes, the issue of crossing rights "affects the measure of damages or just compensation." The United States of America's Resp. and Mem. in Opp'n to Pls.' Mot. for Partial Summ. J. on Crossing Rights ("Def.'s Resp.") at 1. In that respect, Plaintiffs assert that they have lost access to their adjoining land, that the loss of access is a component of the just compensation to which they are entitled, and that the subject adjoining land thus "encumbered by the rail-trail corridor must be valued as essentially a fee taking with the owner having no legal right to use the land for any purpose." Michigan Landowners' Cross-Mot. for Summ. J. on the Taking of their Right to Use and Possess the Land Subject to the Rail-Trail Corridor ("Pls.' Mot.") at 4.

For the reasons stated below, the court denies Plaintiffs' motion for summary judgment and grants summary judgment for Defendant.

I.  Background

A. *Hodges*

In February 2008, Mid-Michigan Railroad, Inc. ("the railroad") filed a petition with the Surface Transportation Board ("STB"), the federal agency (successor to the Interstate Commerce Commission (or "ICC")) charged with regulating the construction, operation, and abandonment of railroad lines, seeking authority to abandon a nearly 25 mile stretch of its rail line between the towns of Lowell and Greenville. The railroad advised the STB that it had reached a memorandum of understanding with a proposed trail operator, the West Michigan Trails and Greenways Coalition ("WMTGC"), on an agreement whereby WMTGC would purchase the line and operate it as a recreational trail, pursuant to the Trails Act. WMTGC then filed a request with the STB for the issuance of a Notice of Interim Trail Use or Abandonment ("NITU") for a 21.88 mile segment of the corridor in question. The STB issued the NITU on June 9, 2008, giving the railroad to December 8, 2008, to reach a trail use/railbanking agreement.

On December 4, 2008, however, the STB was informed by another proposed trail operator, the Friends of the Fred Meier Heartland Trail ("Friends of the Fred"), that WMTGC and the railroad were unable to finalize a trail use agreement and that Friends of the Fred sought to continue the negotiations with the railroad in place of WMTGC. The STB issued a new NITU and extended the negotiation period to June 21, 2009.

In April 2009, Friends of the Fred also sought a NITU for the remaining segment of the corridor in question. The STB issued a NITU for that segment, setting a negotiation period through October 25, 2009. Additional extensions of time, to September 27, 2010, were

---

[1] *Thompson v. United States*, # 09-612 L, was re-captioned as *Austin v. United States* on February 8, 2012, once the Thompson plaintiffs were voluntarily dismissed; the case was then transferred to the undersigned. On February 27, 2012, this court consolidated *Austin* under the lead of *Hodges* as both cases deal with properties along a rail corridor from Greenville, Michigan, to Ionia, Michigan. Appraisal efforts in *Austin* to try to reach a settlement were stymied by the crossing-rights issue, which is presented in both cases.

eventually sought and granted with respect to both segments.  On September 24, 2010, the railroad advised the STB that it had finalized agreement with Friends of the Fred for the sale of the two segments.

    B.  *Austin*

The *Austin* (formerly *Thompson*) case concerns an almost 16-mile rail corridor between the towns of Lowell and Ionia, Michigan.  In December 2007, Mid-Michigan Railroad filed a petition for exemption with the STB to abandon this rail corridor.  In January 2008, WMTGC requested that the STB issue a NITU, which was issued in April 2008, authorizing WMTGC and the railroad to engage in negotiations for a trail use agreement.  The negotiations failed and, in October 2008, Friends of the Friend intervened, requesting an extension of the NITU to allow it, instead of WMTGC, to pursue negotiations to take over the corridor.  The STB issued a new NITU on October 28, 2008; an agreement was reached and the railroad transferred the line to Friends of the Fred via a quitclaim deed on October 31, 2008.  Sale of the line was completed the next month.  Subsequently, Friends of the Fred sold part of the line to the Michigan Department of Natural Resources ("DNR").

    C.  The Trail Use Agreements

In both cases, the trail use agreements, reached between the railroad and the trail operator, provide:

> The conveyance shall be by quitclaim deed conveying all of Seller's right title and interest in the Premises, if any, but shall be expressly subject to: all existing roads . . . and all existing occupancies, encroachments, ways and servitudes, howsoever created and whether recorded or not.

United States of America's Mot. for Partial Summ. J. and Mem. in Supp. Thereof ("Def.'s Mot.") at 7, Exs. A at 4, B at 4 (*Hodges* and *Austin* Trail Use Agreeements).

II.    Legal Standard

Summary judgment is a "salutary method" of procedure under the Rules of the Court of Federal Claims ("RCFC") to dispose of actions, where warranted, in a just, speedy, and inexpensive manner.  *See Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987).  A motion for summary judgment will be granted if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  RCFC 56 (c )(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When considering a summary judgment motion, the court's proper role is not to "weigh the evidence and determine the truth of the matter," but rather "to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A fact is "material" if it "might affect the outcome" of the suit; a dispute is genuine if the evidence is such that a reasonable trier of fact could find for the nonmoving party.  *Id*. at 248.

The party moving for summary judgment may prevail by demonstrating the absence of any genuine issues of material fact or by showing the absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 322-23. If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that there is a genuine issue of material fact. *Id*. at 324. Any inferences that may be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Similarly, "[i]n cases in which there is doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of the nonmovant." *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984). "The movant also must demonstrate its entitlement to judgment as a matter of law." *Id*.

Where, as here, the parties have cross-moved for summary judgment, the court reviews the motions under the same standards. *First Annapolis Bancorp., Inc. v. United States*, 75 Fed. Cl. 263, 275 (2007). "The fact that both parties have moved for summary judgment," however, "does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id*.

III.   Discussion

Liability for a taking has already been established in these cases. What remains is a determination of the just compensation to which the various Plaintiffs are entitled. The parties have endeavoured to proceed with appraisals to ascertain the value of the Plaintiffs' holdings in their "before" and "after" conditions. The crossing-rights issues here, however, have proven an impediment in the efforts of the parties to try to reach settlement on valuation, in particular with respect to how to treat the portions of properties that have been bisected by the rail-trail corridor.

It is well-established that "[t]he owner is to be put in as good a position pecuniarily as he would have occupied if his property had not been taken." *United States v. Miller*, 317 U.S. 369, 373 (1943). Plaintiffs argue that access between the portions of their land-holdings split by the recreational trail has been impeded and that the loss of that access diminishes the value of what would otherwise be their adjoining land. Thus, they seek what the Federal Circuit has described as severance damages: "In cases of a partial physical taking as that here, just compensation under the takings clause of the Constitution includes 'not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from that taking . . . .'" *Hendler v. United States*, 175 F.3d 1374, 1383 (Fed. Cir. 1999) (quoting *United States v. Grizzard*, 219 U.S. 180, 183 (1911). In this respect, Plaintiffs argue, "The STB's invocation of § 1247 completely pre-empted these owners' right under Michigan state law to use and possess the land encumbered by this rail-trail corridor easement. These owners have no legally enforceable right to compel the STB, the current trail sponsor, or a future railroad to grant them the right to construct a road crossing across this railroad right–of–way." Pls.' Mot. at 41.

Accordingly, Plaintiffs argue that the land encumbered by loss of access "must be valued as essentially a fee taking with the owner having no legal right to use the land for any purpose." *Id.* at 4.

Whereas Plaintiffs thus maintain that the lands so encumbered must be valued as if they had been fully taken, in the same manner as the land underlying the corridor itself, Defendant by contrast seeks summary judgment that the Trails Act has not eliminated *any* Plaintiffs' pre-existing crossing rights. "[T]o the extent that the Plaintiffs had pre-existing crossings rights, those rights were expressly preserved by the language of the trail use agreements." Def.'s Mot. at 1.

Defendant explains that, when the railroad quitclaimed its interests to the trail operators, "it conveyed no more than the railroad possessed; in Michigan a quit claim 'conveys a grantor's complete interest or claim in certain real property . . .'" *Id.* at 8 (quoting *Mich. Dep't of Natural Res. v. Carmody-Lahti Real Estate, Inc.*, 699 N.W.2d 272, 283 (Mich. 2005). Thus, Defendant avers, the trail groups are "expressly subject" to the crossing rights of the property owners before the rail corridor was converted from a railroad right-of-way to a railbanked recreational trail. "[T]he operation of the Trails Act does not, in any way, interfere with, forestall, or foreclose Plaintiffs' existing crossing rights. . ." Def.'s Mot. at 8-9.

Defendant describes three categories of properties with crossing rights at issue here: 1) properties with crossing rights preserved in original recorded conveyances to the railroad; 2) properties with unrecorded, but otherwise established crossings that are visible on aerial maps; and 3) otherwise landlocked parcels – "on the other side of the subject right-of-way" – that are entitled to an easement by necessity and implication under Michigan law.

Before assessing the impact of the Trails Act on these three categories of properties, however, it is necessary to address Plaintiffs' more general argument that their state law rights "were preempted when the STB invoked § 1247(d)." Michigan Landowners' Resp. and Reply to Government's Cross-Mot. for Partial Summ. J on After-Taken Condition in Which to Value the Property ("Pls.' Resp.") at 5. Plaintiffs argue that, when the STB invokes § 1247(d) of the Trails Act, which provides the specific authority for a railroad to transfer its right-of-way to a trail operator without it being considered "abandonment" under state law, "the federal government pre-empts, 'destroys' and 'effectively eliminates' an owner's state law right to use and possess the land subject to the STB order." *Id.* "The STB's perpetual jurisdiction over the land *completely* preempts an owner's state law rights to the land." *Id.* at 6 (emphasis added).

In support, for example, Plaintiffs cite *Grantwood Vill. v. Mo. Pac. R.R. Co.*, 95 F.3d 654, 658 (8th Cir. 1996), wherein the court held that "federal law preempts state law on the question of abandonment while the ICC retains jurisdiction over the right-of-way." The government does not dispute, however, that *abandonment* of the railroad right-of-way is pre-empted by the operation of the Trails Act. As the court in *Grantwood Village* put it, "the ICC's determination of abandonment is plenary, pervasive, and exclusive of state law." *Id.* Plaintiffs, however, lack case support for their broader pre-emption argument that the Trails Act precludes all state law property law claims. In arguing that "[t]he entire purpose of § 1247(d) of the Trails Act was to preempt *any* contrary state-law property rights," Pls.' Mot. at 38 (emphasis added),

-5-

they cite case authority, such as *Preseault v. I.C.C.*, 494 U.S. 1 (1990), and *Nat'l Wildlife Fed'n v. I.C.C.*, 850 F.2d 694 (D.C. Cir. 1988), that relates to abandonment, but which adds nothing to buttress their overarching pre-emption argument.

Defendant, on the other hand, has marshalled persuasive case authority that state law claims, other than as to abandonment, have not been precluded by the Trails Act. In *Illig v. Union Electric Co.*, No. 4:03-135, 2010 WL 4386789 (E.D. Mo. Oct. 29, 2010), the District Court, after acknowledging that the Trails Act supports pre-emption of state law *abandonment* provisions, held nevertheless that state law claims of inverse condemnation and trespass were not necessarily precluded. "Allowing state law claims against trail groups does not undermine congressional intent to encourage development of trails or preserve railroads." *Id.* at *6. In a similar vein, the STB also has recognized that not all state law claims are pre-empted by the Trails Act. In *Jie Ao and Xin Zhou – Petition for Declaratory Order*, Docket No. 35539, 2012 WL 2047726 (S.T.B.), the Board held that the petitioners' dispute as related to a non-exclusive prescriptive easement was appropriate for state law determination so long as it did not impede rail operations. "Routine non-conflicting uses, such as non-exclusive easements for at-grade crossings, are not preempted, as long as they would not impede rail operations or pose undue safety risks." *Id.* at *6. The Board noted that a prescriptive easement, unlike an adverse possession claim, "does not take railroad property outright," and therefore that "property disputes involving prescriptive easements are generally best addressed by state courts applying state law." *Id.* at *7.

In *Illig v. United States*, 58 Fed. Cl., 619 (2003), a predecessor decision to the *Illig* decision, *supra*, in United States District Court in Missouri, the Court of Federal Claims addressed the nature of the easement acquired from the railroad by a successor trail operator. The plaintiff landowners were objecting to the continuation of a license in favor of the trail operator of an electric utility's Wire Line Crossing Agreement, which the railroad had negotiated with the utility many years before. The court observed that "what was imposed on plaintiffs' land was a new easement," but was nonetheless one "which retained essentially the same characteristics as the original easement." *Id.* at 631. The court further noted that the "scope of the new easement" was informed by the negotiations involved in reaching the trail use agreement. *Id.* at 632 n.19. To the extent, however, that a utility license was not for a legitimate railroad purpose, which condition governed the easement that the trial operator in turn obtained, "as against such users, plaintiffs would have to bring any claims in state court." *Id.* at 634.

These cases cited by Defendant and the paucity of legal authority for Plaintiffs' proposition that the Trails Act has preempted all their state law claims convince this court that, other than asserting state law claims of abandonment, Plaintiffs here are no-wise impeded from exercising whatever rights of access they held that pre-existed the conversion of the railroad corridor to recreational usage.

Thus, in the first category of properties as distinguished by Defendant, that is, those with crossing rights preserved in the original recorded deeds, there is no basis for Plaintiffs' argument that the "severed" portion of their land has essentially been taken in fee. The Trails Act has not "destroyed" or "eliminated" their pre-existing crossing rights, as Plaintiffs maintain. *See* Pls.' Resp. At 5. The "destroy" and "eliminate" language that Plaintiffs cites is taken from Federal

Circuit rails-to-trails decisions referring only to the effect of the issuance of a NITU by the STB on the landowners' *reversionary* rights, but it is too much of a stretch to construe that language as extending to all other possible state law claims. *See Caldwell v. United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004); *Preseault v. United States*, 100 F.3d 1525, 1552 (Fed. Cir. 2006) ("*Preseault II*").

With respect to the second category of properties, in which there are no recorded crossing rights but which, according to Defendant, there are established crossings visible on aerial maps, Defendant argues, "Plaintiffs have provided no evidence that, over the several years since the issuance of the NITU, that the Trails Act has interfered with any of these crossings." Def.'s Resp. at 5. Furthermore, Defendant emphasizes that the Trail Use Agreements preserves "all existing roads . . . and all existing occupancies, encroachments, ways and servitudes, howsoever created and whether recorded or not."

The court finds that Defendant is correct with respect to the impact, or lack thereof, of the Trails Act on these established, but unrecorded crossings. To that extent, the status quo ante has not been disturbed by the transformation of the railroad corridor into a recreational trail. The trail operator's "scope of easement," as was recognized by the Court of Federal Claims in *Illig*, "retain[s] essentially the same characteristics as original easement." *Illig*, 58 Fed. Cl. at 631. On the other hand, Plaintiffs make a telling point that the trail use agreements are private agreements between the railroad and the trail operator (at least the initial trail-sponsor). The Plaintiffs here were not parties to the trail use agreements and were not consulted in the drafting of the agreements; nor are the agreements public or even filed with the STB. Plaintiffs further argue rather convincingly that they would lack the status of third-party beneficiaries to seek to enforce any provision of the agreements. Thus, any obligation on the part of the trail operator to respect "all existing roads . . . ways and servitudes" may be somewhat ephemeral.

In *Moore v. United States*, 61 Fed. Cl. 73 (2004), the court faced a similar question in weighing the value of severance damages on the claim of a loss of access across a recreational trail converted from a railroad right-of-way. The government's expert concluded that severance damages were not warranted because the trail operator, the Department of Natural Resources in Missouri ("MDNR"), had, by letter, "indicated its intention to allow crossing of the trail for access to the property for the duration of the interim trail use easement." *Id.* at 77. The court, however, questioned the strength of the "apparently revocable promise" of the letter. "There does not appear to be any reason why MDNR could not simply ignore the promise made in this letter and restrict plaintiffs' access in the future." *Id.* at 78. Nevertheless, the court observed that the inquiry for valuation purposes was not the "precise legal effect of the letter," but rather "what a willing buyer would pay for the property" in light of the potential loss of access across the trail. *Id.* at 78-79. The court doubted defendant's expert's conclusion, but the plaintiffs had offered no countervailing data about valuing the severance damages. Ultimately, the court sided with defendant in part on the recognition that, under Missouri law, the state could not entirely cut off access to what would otherwise be a landlocked parcel if access was a matter of "strict necessity." *Id.* at 79.

Thus, here, whatever established, but unrecorded, crossings there may be between bisected parcels, and whatever rights the owners may or may not have to utilize those crossings,

it is not the case that the Trails Act per se has impaired Plaintiffs' rights to any greater extent. It is also not material whether, if resort is necessary to state court, Plaintiffs may seek to vindicate their crossing rights on the basis of the trail use agreements, to which they were not parties, or independently by arguments based on other aspects of state property law. Presumably the parties' appraiser(s) will take into consideration the existence of crossings of this nature and assess the value of the parcels accordingly. The court has not been tasked at this point with judging any such competing valuations.

Similarly situated, then, are the properties in the third category, those without either recorded crossing rights or otherwise established crossings. As Defendant argues, "Under Michigan law, Plaintiffs whose land appears to be severed, including those who do not have an existing crossing visible in aerial maps, can obtain an easement via the doctrine of necessity." Def.'s Mot. at 12. Alternatively, they may seek to vindicate crossing rights via implication or quasi-easement. The criteria for easements by necessity and those for quasi-easements are distinct, but both recognize Michigan's public policy "that favors the productive and beneficial use of property." *Chapdelaine v. Sochocki*, 635 N.W.2d 339, 343 (2001). The Trails Act has not diminished their ability to seek relief in state court in these respects.

Plaintiffs argue, however, that, on the date of the taking – when the NITUs were first issued – the affected landowners did not then possess "existing" rights to an easement by necessity. Pls.' Resp. at 18. They also dispute whether they would be granted an easement by necessity under Michigan law, citing *Dep't of Natural Resources v. Lecureux*, No. 242695, 2004 WL 895895 (Mich. Ct. App. Apr. 27, 2004), and aver that "[a]n easement by necessity is not an existing right to use the land under the rail-trail corridor but is, at best, a lengthy and expensive lawsuit with an uncertain outcome." *Id.* at 21. The court, here, however, is not called upon to determine in the first instance whether various Plaintiffs are entitled to an easement by necessity or otherwise. The question is, rather, whether the Trails Act, pursuant to which the corridor use was converted from railroad purposes to recreational usage, has foreclosed Plaintiffs' ability to seek to establish and/or to vindicate crossing rights.

It is also not before the court whether the access across the trail that Plaintiffs have or may establish comports with the "highest and best use" of their properties that they might otherwise attain had the railroad abandoned its easement but for the Trails Act. For example, Plaintiffs complain that the "cattle passes" reserved in certain original conveyances would not provide "sufficient road and utility access" for more fully developing their parcels. *Id.* at 14. That is because, as they note, "Michigan does not allow the burden of an easement to be increased." *Id.* (citing *Schadewald v. Brule*, 225 Mich. App. 26, 35-40 (1997). Similarly, with respect to the non-recorded, but established crossings, they aver, "there is no showing that these aerial photos of supposed 'crossings' are of sufficient width to allow roads and utilities necessary to develop the property to the same highest and best use as in the before-taken condition." *Id.* at 16. Additionally, they note that, where certain Plaintiffs' property may not be landlocked because it has "alternate circuitous" access by other means, that alternate access nevertheless "does not mitigate the loss of direct access to the now-severed tract of land." *Id.*

Plaintiffs appropriately forecast that a "prudent purchaser would vastly prefer to buy a non-landlocked property to avoid the inevitable delay and expense that would accompany any

contentious lawsuit. The resulting diminished market value of the landlocked properties in the after-taken condition must therefore reflect this fact." *Id.* at 23. This observation does not necessarily mean, however, that the Trails Act has legally foreclosed Plaintiffs' putative crossing rights over the trail.

However telling these points may be, if the limitations on any crossing rights to which the various Plaintiffs may be entitled by operation of state property law diminish the highest and best use of their lands, compared to what would be the case if the parcels were not bifurcated by virtue of the recreational trail, then such diminished value ought to be reflected in the parcels' appraisals in the "after" condition. The difference in the "before" and "after" valuations would presumably be the just compensation to which Plaintiffs are entitled under the Fifth Amendment.

In any event, Plaintiffs have not demonstrated that the Trails Act itself has effected any further diminution of their crossing rights other than that it foreclosed the abandonment of the railroad's easement in the first place.

IV.     Conclusion

Accordingly, Plaintiffs' motion for summary judgment – that the Trails Act has eliminated crossing rights over the trail to the severed portion of their properties and that such parcels must therefore be valued as if having been taken in fee – is denied. Defendant's motion for summary judgment – that the Trails Act has not eliminated any of Plaintiffs' pre-existing crossing rights – is granted.

The parties shall file a Joint Status Report, due on or before July 19, 2013, addressing how they propose to proceed.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge